**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KATHLEEN T. PITCHFORD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **2:07-cv-440** |
| | ) | |
| **BOROUGH OF MUNHALL,** | ) | |
| **OFFICER JAMES ILGENFRITZ,** | ) | |
| **OFFICER GREG GARCIA, OFFICER** | ) | |
| **MICHAEL CURTAIN, and OFFICER** | ) | |
| **DARRAN CHEREB, individually and** | ) | |
| **as police officers and officials for the** | ) | |
| **Borough of Munhall, DANIEL** | ) | |
| **CHEREVKA and KATHY JO** | ) | |
| **CHEREVKA,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER OF COURT

Before the Court for disposition are the MOTION TO DISMISS filed by Defendants
Borough of Munhall ("Munhall"), Officer James Ilgenfritz ("Ilgenfritz"), Officer Greg Garcia
("Garcia"), Officer Michael Curtain[1] ("Curtain"), and Officer Darran Chereb ("Chereb")
(*Document No. 8*), with brief in support (*Document No. 9*), Plaintiff Kathleen T. Pitchford's
("Pitchford") brief in opposition to the motion to dismiss filed by Munhall, Ilgenfritz, Garcia,
Curtain and Chereb (*Document No. 11*), Pitchford's responsive pleading to the motion to dismiss
(*Document No. 12*), the reply brief filed by Munhall, Ilgenfritz, Garcia, Curtain and Chereb
(*Document No. 13*), the MOTION TO DISMISS filed by Defendants Daniel Cherevka ("Daniel")
and Kathy Jo Cherevka ("Kathy Jo") (*Document No. 14*), with brief in support (*Document No.*

---

[1]Plaintiff Kathleen Pitchford acknowledges that she may have misspelled the name of
Officer Michael Curtain, whose name is spelled as "Curtan" in the Defendants' filings. Doc. No.
16, p. 1, n. 1. The Court will continue to spell his name in the manner consistent with the
caption unless and until it is specifically advised by the Defendants that the correct spelling is
"Curtan."

14), Pitchford's responsive pleading to the Cherevkas' motion to dismiss (*Document No. 15*), and Pitchford's brief in opposition to the Cherevkas' motion to dismiss (*Document No. 16*). These motions have been extensively briefed and are ripe for resolution.

## Background

Pitchford commenced this action against the Defendants on April 3, 2007, which alleges violations of the Fourth and Fourteenth Amendments to the Constitution of the United States and the tort law of the Commonwealth of Pennsylvania. Doc. No. 1, ¶¶ 49-81. She brought her federal constitutional claims pursuant to 42 U.S.C. § 1983. The Court has jurisdiction over these federal claims pursuant to 28 U.S.C. §§ 1331 and 1343. The Court has supplemental jurisdiction over Pitchford's claims which arise under Pennsylvania law pursuant to 28 U.S.C. § 1367. Venue is proper under 28 U.S.C. § 1391(b).

Munhall, Ilgenfritz, Garcia, Curtain and Chereb filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) on May 2, 2007. Doc. No. 8. The Cherevkas filed a motion to dismiss pursuant to Rule 12(b)(6) on July 13, 2007. Doc. No. 14. Since the matter comes before the Court in this posture, the allegations contained in the complaint are assumed to be true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S.Ct. 2499, 2509 (2007). Although "heightened fact pleading of specifics" is not required for a plaintiff to survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corporation v. Twombly*, 127 S.Ct. 1955, 1974 (2007).

According to the allegations set forth in the complaint, Pitchford is an adult individual who resides in Munhall, Pennsylvania. Doc. No. 1, ¶ 3. Munhall, a political subdivision of the Commonwealth of Pennsylvania, owns, operates, manages, directs and controls the Munhall Borough Police Department ("Police Department"). *Id.*, ¶ 4. The Police Department employs Ilgenfritz, Garcia, Curtain and Chereb. *Id.* Munhall owns and operates the municipal building which houses the Police Department. *Id.* At all times relevant to this case, Ilgenfritz, Garcia, Curtain and Chereb were police officers. *Id.*, ¶ 5. Daniel and Kathy Jo, who are husband and wife, reside in Munhall. *Id.*, ¶¶ 7-8. Pitchford has a daughter named Gemma, and the Cherevkas have a son named Chad. *Id.*, ¶ 9. During the relevant period of time, Chad was apparently Gemma's boyfriend. *Id.*

At approximately 4:00 P.M. on April 22, 2005, Pitchford went to the Cherevkas' home to persuade Gemma to return home, to retrieve her car from Gemma, and to inform Gemma that she was "grounded." *Id.* After Pitchford and Chad exchanged words, Chad told her to leave the property.[2] *Id.* After speaking with Chad, Pitchford returned home. *Id.* Kathy Jo and Chad proceeded to contact the Police Department, complaining that Pitchford had been harassing them. *Id.*, ¶ 10. Ilgenfritz responded by going to the Cherevka residence. *Id.* Upon his arrival, Ilgenfritz was presented with a document which the Cherevkas' referred to as a Protection From Abuse ("PFA") order. *Id.* Apparently, no PFA order had ever been entered against Pitchford. *Id.*, ¶ 11. Instead, the document presented to Ilgenfritz by the Cherevkas was an order entered by the Court of Common Pleas of Allegheny County in the case of *Kathleen Pitchford v. Norman Benning, III*, No. FD 88-7805-001, pursuant to Norman Benning's ("Benning") Amended Emergency Petition for Special Relief.[3] *Id.*, ¶ 12. The order indicated that Pitchford was not permitted to have contact with the Cherevkas, and that the Cherevkas were not permitted to have contact with Pitchford, pending a hearing scheduled before Judge Della Vecchia on September 22, 2004.[4] *Id.* This order had been entered on June 29, 2004, with the Cherevkas present in the courtroom. *Id.*, ¶ 13. After learning of this order in the presence of Kathy Jo, Ilgenfritz advised that she could go to "night court" for the purpose of filing a private criminal complaint against Pitchford. *Id.*, ¶ 15.

Pursuant to 23 Pa.C.S. § 6105(e), the Pennsylvania State Police is required to maintain a

---

[2]Pitchford does not explain the precise nature of her conversation with Chad. On an indirect criminal contempt complaint form completed on April 22, 2005, and made available to the Court by the Defendants, Daniel reported that Pitchford had told Chad that his mother (i.e., Kathy Jo) was "retarded." Doc. No. 8-2, p. 1. Daniel stated that Pitchford arrived at the Cherevkas' home "irate" around 4:30 P.M., and that she had called the home (apparently on the telephone) ten minutes before her arrival. *Id.* He also indicated that Pitchford had called Chad on his cellular phone nine times. *Id.*

[3]Although the complaint does not explain who Norman Benning is, Pitchford explains in her brief in opposition to the Cherevkas' motion to dismiss that Benning is Gemma's father. Doc. No. 16, p. 3.

[4]The Cherevkas are apparently contending that this hearing never occurred, and that the order was still in effect on April 22, 2005. Doc. No. 14, ¶ 9.

statewide registry of PFA orders. This registry is available to police officers throughout the Commonwealth. 23 Pa.C.S. § 6105(e)(3)("The registry of the Pennsylvania State Police shall be available at all times to inform courts, dispatchers and law enforcement officers of any valid protection order involving any defendant."). Pitchford alleges that Ilgenfritz had not reviewed the registry before advising Kathy Jo to file a private indirect criminal complaint against her. Doc. No. 1, ¶ 16.

At approximately 8:45 P.M. on April 22, 2005, Daniel appeared before a magistrate and filed a private criminal complaint against Pitchford. *Id.*, ¶ 17. He stated under oath that Pitchford's actions had constituted a violation of a PFA order, and he requested that a warrant be issued for Pitchford's arrest. *Id.* The magistrate issued the warrant. *Id.*, ¶ 18. Pitchford alleges that the Cherevkas intentionally and/or recklessly provided incorrect information to Ilgenfritz and the magistrate for the purpose of effectuating her arrest and detention. *Id.*, ¶ 19.

Garcia, Curtain and Chereb arrived at Pitchford's residence in three separate vehicles at approximately 3:00 P.M. on April 23, 2005. *Id.*, ¶ 20. They asked to see Pitchford's driver's license, and she complied with their request. *Id.* Garcia arrested Pitchford. *Id.*, ¶ 21. Pitchford alleges that Garcia, Curtain and Chereb had not reviewed the PFA registry before they encountered her, and that they would have become aware of the fact that no PFA order had been entered against her had they taken the time to do so. *Id.*, ¶ 22. Garcia placed Pitchford in handcuffs, and the three officers proceeded to escort her to the back of Garcia's police car. *Id.*, ¶ 25. At least one (and possibly more) of Pitchford's neighbors saw her being taken out of her home in handcuffs. *Id.*, ¶ 26. Garcia transported Pitchford to the Munhall Police Station. *Id.*, ¶ 25. Curtain and Chereb followed Garcia in their own police cars. *Id.*

During the ride in the police car, Pitchford overheard Garcia mumble something about a PFA order. *Id.*, ¶ 27. Pitchford informed Garcia that she had never been served with a PFA order. *Id.* She indicated that any PFA order against her would have been recorded at the Munhall Police Station, and that the officers had made a mistake in arresting her. *Id.*

Upon her arrival at the Munhall Police Station, Pitchford was placed in a filthy holding cell which appeared to her to be encrusted with old feces. *Id.*, ¶ 28. She remained in a standing position in order to avoid contact with the feces. *Id.* While detained in the cell, Pitchford

overheard an argument between several police officers concerning the absence of a PFA order. *Id.*, ¶ 29. One officer exclaimed, "We have to let her go." *Id.* Garcia opened the door and informed Pitchford that a constable had been called to take her "downtown." *Id.*, ¶ 30. When Pitchford again told Garcia that a "terrible mistake" had been made, Garcia replied, "That's right. You are a legal assistant. You know everything." *Id.* Despite Pitchford's insistence that no PFA order had ever been entered against her, the officers did not check the registry in order to determine whether her contention was accurate. *Id.*, ¶ 31.

Allegheny County Constable John Lieber ("Lieber") arrived at the Munhall Police Station about one hour later. *Id.*, ¶ 32. Pitchford told Lieber that a mistake had been made, but Lieber responded by saying that he was only doing his job by following Chereb's instructions. *Id.* Lieber escorted Pitchford to the Allegheny County Jail for processing. *Id.*, ¶ 33. She was placed in a jail cell with two other women, one of whom had been accused of drug possession and the other of whom had been accused of prostitution. *Id.*

After spending approximately two hours in the cell, Pitchford felt her heart starting to race. *Id.*, ¶ 34. Her palms became "clammy," and she felt short of breath. *Id.* Although Pitchford knocked on the door repeatedly, the officers initially ignored her. *Id.* When a female officer finally came to the door, Pitchford politely asked to be taken to the nurse's station. *Id.* The nurse indicated to Pitchford that her blood pressure was elevated, and that she was having an anxiety attack. *Id.*, ¶ 35. Pitchford asked the nurse if she could remain in the nurse's station, since she was getting "claustrophobic," but the nurse responded by telling her that she had to be returned to her cell. *Id.*, ¶ 36. Pitchford was subsequently escorted back to the cell. *Id.*

Around midnight, Pitchford was taken to another cell. *Id.*, ¶ 37. She was told that she would be going to "night court" to be arraigned. *Id.* About thirty minutes later, Pitchford was shackled to five male inmates and taken to "night court." *Id.*, ¶ 38. While shackled and in handcuffs, Pitchford was placed in another holding cell. *Id.*, ¶ 39.

Pitchford later appeared before a magistrate. *Id.*, ¶ 40. During the hearing, the magistrate repeatedly indicated that he could not find an existing PFA order against Pitchford. *Id.* Pitchford informed the magistrate that no PFA order had ever being entered against her. *Id.*, ¶ 41. The magistrate responded by listing Pitchford's bond at zero, thereby providing for her immediate

release.  *Id.*, ¶ 42.  Before her departure from the courtroom, the magistrate told Pitchford "off the record" that a great injustice had been done to her, that she never should have been taken into custody, and that she had grounds for a lawsuit.  *Id.*  On April 27, 2005, Pitchford appeared before Judge Eugene Scanlon, who dismissed the case against her on the ground that no PFA order had ever been entered against her.[5]  Doc. No. 8-2, p. 3.

As a result of her arrest and detention, Pitchford suffered from severe depression and anxiety.  Doc. No. 1, ¶ 44.  Her primary care physician prescribed anti-anxiety and anti-depressant medications for her, which she had to take for approximately eighteen months.  *Id.*  Pitchford was also treated by a psychologist.  *Id.*, ¶ 45.  Pitchford's arrest exacerbated her Crohn's disease and caused her to gain fifty pounds.  *Id.*, ¶ 46.  Pitchford had accepted a job offer from the Pennsylvania Office of Attorney General in April 2005, and she was scheduled to start in June 2005.  *Id.*, ¶ 47.  In early May 2005, she received notice that the employment offer had been rescinded.  *Id.*  She believes that the reason for her loss of this employment opportunity was a criminal background check which revealed her recent arrest.  *Id.*  She continues to suffer a loss of wages due to this lost employment opportunity, as well as humiliation and embarrassment in her community.  *Id.*, ¶¶ 47-48.

### Discussion

Pitchford's complaint contains six counts.  Count I alleges that Ilgenfritz, Garcia, Curtain and Chereb violated Pitchford's rights under the Fourth and Fourteenth Amendments.  *Id.*, ¶¶ 49-56.  In Count II, she asserts that Munhall is liable under § 1983 for causing the constitutional violations that she suffered.  *Id.*, ¶¶ 57-62.  Count III alleges that Garcia, Curtain and Chereb committed the tort of false arrest, which is recognized under Pennsylvania law.  *Id.*, ¶¶ 63-66.  In Count IV, Pitchford alleges that Ilgenfritz, Garcia, Curtain and Chereb committed the tort of false imprisonment.  *Id.*, ¶¶ 67-73.  Counts V and VI assert claims against the Cherevkas for the torts

---

[5]In her complaint, Pitchford alleges that the case against her was dismissed by "Judge Strassburger."  Doc. No. 1, ¶ 43.  Nevertheless, the Court has the relevant order before it, and it was signed by Judge Eugene Scanlon.  Doc. No. 8-2, p. 3.  In her brief in opposition to the Cherevkas' motion to dismiss, Pitchford acknowledges that her complaint's reference to "Judge Strassburger" had been an error, and that the order was actually signed by Judge Scanlon.  Doc. No. 16, p. 4, n. 3.

of false imprisonment and intentional infliction of emotional distress. *Id.*, ¶¶ 74-81. Because the Court is convinced that the motion to dismiss filed by Munhall, Ilgenfritz, Garcia, Curtain and Chereb must be granted with respect to Counts I and II of the complaint, there is no need for the Court to address Counts III, IV, V and VI. Since Pitchford's federal law claims will be dismissed, the Court will decline to exercise supplemental jurisdiction over her state law claims pursuant to 28 U.S.C. § 1367(c)(3).

Counts I and II of Pitchford's complaint are based on alleged violations of the Fourth and Fourteenth Amendments. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. The Fourth Amendment is applicable to state actors such as Munhall, Ilgenfritz, Garcia, Curtain and Chereb because it is incorporated within the Due Process Clause of the Fourteenth Amendment. *Maryland v. Pringle*, 540 U.S. 366, 369 (2003). Section 5 of the Fourteenth Amendment gives Congress the power to enforce, "by appropriate legislation," the substantive provisions of that Amendment. U.S. CONST. amend. XVI, § 5. Pursuant to this grant of authority, as well as other constitutional sources of federal legislative jurisdiction, Congress has enacted 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983. Section 1983 does not create substantive rights. *Maher v. Gagne*, 448 U.S.

122, 129, n. 11 (1980).  Consequently, a plaintiff cannot prevail in an action brought under §
1983 without establishing an underlying violation of federal law.  *Collins v. City of Harker
Heights*, 503 U.S. 115, 119 (1992)("Although the statute provides the citizen with an effective
remedy against those abuses of state power that violate federal law, it does not provide a remedy
for abuses that do not violate federal law[.]").

Although the statutory language speaks of no immunities, the United States Supreme
Court has always assumed that Congress would have expressly abolished common law
immunities within the language of § 1983 if it had intended to do so.  *Pierson v. Ray*, 386 U.S.
547, 554-555 (1967).  For this reason, the "qualified immunity" that was available to state
officials at common law is available to defendants such as Ilgenfritz, Garcia, Curtain and Chereb.
*Kalina v. Fletcher*, 522 U.S. 118, 131-135 (1997)(Scalia, J., concurring)(discussing the common
law origins of different forms of immunity available to officials sued under § 1983).  While
Ilgenfritz, Garcia, Curtain and Chereb focus their arguments primarily on the underlying
constitutional issue (i.e., whether their actions constituted a violation of the Fourth Amendment),
it is also clear that they are raising the defense of qualified immunity.  Doc. No. 9, p. 7 ("Law
enforcement officers who arrest on the basis of such a warrant are immune from suits alleging a
constitutional violation."); Doc. No. 13, pp. 3-5.

In *Saucier v. Katz*, 533 U.S. 194, 200 (2001), the Supreme Court made it clear that a
federal court, when presented with a qualified immunity defense, must first determine whether
the facts alleged in the complaint, taken in the light most favorable to the plaintiff, establish a
violation of the applicable constitutional or statutory provision.  If an actionable violation of
federal law is properly alleged, the Court must proceed to determine whether it would have been
clear to a reasonable officer that his or her conduct was unlawful under the circumstances that he
or she confronted.  *Saucier*, 533 U.S. at 202.  Qualified immunity is an immunity from suit, not
just a defense to the ultimate imposition of liability.  Consequently, a denial of qualified
immunity constitutes a "final decision" within the meaning of 28 U.S.C. § 1291, thereby
conferring jurisdiction upon a federal appellate court to review such a denial.  *Behrens v.
Pelletier*, 516 U.S. 299, 301 (1996).  The Supreme Court has consistently made it clear that the
issue of qualified immunity should be resolved at the earliest possible stage in the litigation.

*Scott v. Harris*, 127 S.Ct. 1769, 1773, n. 2 (2007). With that in mind, the Court now turns to the question of whether Pitchford has properly alleged a violation of the Fourth Amendment.

As in any case brought under § 1983, the Court must proceed to "identify the exact contours of the underlying right said to have been violated." *County of Sacramento v. Lewis*, 523 U.S. 833, 842, n. 5 (1998). Pitchford alleges that she was illegally "seized" for the purpose of the Fourth Amendment. Doc. No. 1, ¶¶ 49-62. A Fourth Amendment "seizure" occurs when there is a governmental termination of one's freedom of movement through means intentionally applied. *Brower v. County of Inyo*, 489 U.S. 593, 597 (1989). Pitchford alleges that she was arrested and detained. Doc. No. 1, ¶¶ 21-42. Thus, she properly alleges that she was "seized."

The Fourth Amendment, however, does not proscribe all seizures. The constitutionality of Pitchford's arrest depends on whether it was "unreasonable" within the meaning of the Fourth Amendment. She alleges that she was arrested pursuant to an arrest warrant. *Id.*, ¶ 18. Hence, the question of whether her arrest constituted an "unreasonable" seizure depends on whether the magistrate who issued the arrest warrant had "probable cause" to believe that Pitchford had committed a crime.[6] U.S. CONST. amend. IV.

The arrest warrant at issue in this case was based on an alleged violation of the

---

[6]Following the analysis employed by the United States District Court for the Eastern District of Pennsylvania in *Kis v. County of Schuylkill*, 866 F.Supp. 1462, 1469 (E.D.Pa. 1994), the police officers assert that probable cause to arrest exists when an officer has a facially valid arrest warrant, and that police officers who arrest an individual pursuant to such a warrant are immune from civil lawsuits alleging constitutional violations. Doc. No. 9, pp. 6-7. This argument conflates two distinct issues. *Kis* was decided before the Supreme Court's decision in *Saucier v. Katz*, 533 U.S. 194 (2001). In *Saucier*, the Supreme Court made it clear that the question of whether the alleged conduct constituted a violation of federal law must be addressed independently from, and prior to, the distinct question of whether the relevant defendant is entitled to qualified immunity. *Saucier*, 533 U.S. at 201 ("This is the process for the law's elaboration from case to case, and it is one reason for our insisting upon turning to the existence or nonexistence of a constitutional right as the first inquiry. The law might be deprived of this explanation were a court simply to skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case."). For this reason, the Court will analyze these issues separately, to avoid the confusion manifested in some judicial opinions that predated *Saucier*. It is clear that "an erroneously issued warrant cannot provide probable cause for an arrest." *Berg v. County of Allegheny*, 219 F.3d 261, 269-270 (3d Cir. 2000). The Court cannot agree with the reasoning posited by the officers.

Pennsylvania Protection From Abuse Act ("PFAA") [23 Pa.C.S. § 6101 *et seq.*].  Doc. No. 8-2, p. 1.  The PFAA requires the Pennsylvania State Police to establish a statewide registry of PFA orders.  23 Pa.C.S. § 6105(e).  The statutory language unambiguously states that "[t]he registry of the Pennsylvania State Police shall be available at all times to inform courts, dispatchers and law enforcement officers of any valid protection order involving any defendant."  23 Pa.C.S. § 6105(e)(3).  The PFAA establishes procedures providing for the entry of PFA orders.  23 Pa.C.S. §§ 6106-6112.  The relevant portions of the statute provide:

### § 6113.  Arrest for violation of order

**(a) General rule.**–An arrest for violation of an order pursuant to this chapter or a foreign protection order may be without warrant upon probable cause whether or not the violation is committed in the presence of the police officer or sheriff in circumstances where the defendant has violated a provision of an order consistent with section 6108(a)(1), (2), (3), (4), (6), (7) or (9) (relating to relief).  The police officer or sheriff may verify the existence of a protection order by telephone, radio or other electronic communication with the appropriate police department, Pennsylvania State Police registry, protection order file or issuing authority.  A police officer or sheriff shall arrest a defendant for violating an order issued under this chapter by a court within the judicial district, issued by a court in another judicial district within this Commonwealth or a foreign protection order issued by a comparable court.

\*\*\*

**(c) Procedure following arrest.**–Subsequent to an arrest, the defendant shall be taken by the police officer or sheriff without unnecessary delay before the court in the judicial district where the contempt is alleged to have occurred.  When that court is unavailable, the police officer or sheriff shall convey the defendant to a magisterial district judge designated as appropriate by local rules of court or, in the city of Pittsburgh, to a magistrate of the Pittsburgh Magistrates Court or, in counties of the first class, to the appropriate hearing officer.  For purposes of procedure relating to arraignments for arrest for violation of an order issued under this chapter, the judges of Pittsburgh Magistrates Court shall be deemed to be magisterial district judges.

**(d) Preliminary arraignment.**–The defendant shall be afforded a preliminary hearing without unnecessary delay.

\*\*\*

**(f) Hearing.**–A hearing shall be scheduled within ten days of the filing of the charge or complaint of indirect criminal contempt.  The hearing and any

10

adjudication shall not preclude a hearing on other criminal charges underlying the contempt, nor shall a hearing or adjudication on other criminal charges preclude a hearing on a charge of indirect criminal contempt.

\*\*\*

### § 6113.1.   Private criminal complaints for violation of order or agreement

**(a) General rule.–**A plaintiff may file a private criminal complaint against a defendant, alleging indirect criminal contempt for a non-economic violation of any provision of an order or court-approved consent agreement issued under this chapter or a foreign protection order, with the court, the office of the district attorney or the district justice in the jurisdiction or county where the violation occurred, except that, in a city of the first class, a complaint may only be filed with the family division of the court of common pleas or the office of the district attorney.

23 Pa.C.S. §§ 6113, 6113.1.  It is clear from the record that the warrant for Pitchford's arrest was based on her alleged violation of a PFA order.  Doc. No. 8-2, p. 2.  It is likewise clear from the record that the charge against her was ultimately dismissed because there was no PFA order entered against her with respect to the Cherevkas.  *Id.*, p. 3.

The first issue for consideration is whether the magistrate had probable cause to issue a warrant for Pitchford's arrest.  The applicable precedents recognize that "[p]robable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction."  *Adams v. Williams*, 407 U.S. 143, 149 (1972).  Instead, it requires only a reasonable belief that the individual arrested probably committed the relevant criminal offense. *Thacker v. City of Columbus*, 328 F.3d 244, 256 (6th Cir. 2003)("Thus, for probable cause to arrest Thacker to exist here, the officers would not have to have proof of each element of a domestic violence offense, but would have to believe that a probability existed that he committed the offense.").  In *United States v. Yusuf*, 461 F.3d 374, 390 (3d Cir. 2006), the United States Court of Appeals for the Third Circuit explained that probable cause determinations must be made with reference to the "totality of the circumstances," and that courts should avoid the temptation to overcompartmentalize such determinations.  "Probable cause 'means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has

committed, is committing, or is about to commit an offense.'" *Johnson v. Campbell*, 332 F.3d 199, 211 (3d Cir. 2003), quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). An arrest can be based on probable cause even in circumstances where guilt is not deemed to be "more probable than not." *Samos Imex Corporation v. Nextel Communications, Inc.*, 194 F.3d 301, 303 (1st Cir. 1999)("The phrase 'probable cause' is used, in the narrow confines of Fourth Amendment precedent, to establish a standard less demanding than 'more probable than not.' For example, arrests–made long before all proof is assembled for a trial–can be justified as based on probable cause by showing a reasonable basis for belief that a suspect committed a crime; in many cases such a basis exists without a 50 percent-plus likelihood that the suspect is guilty.").

There is no dispute as to what happened in this case. The magistrate issued a warrant for Pitchford's arrest based on Daniel's complaint. Doc. No. 8-2, p. 1. The sole basis for the arrest warrant was Pitchford's alleged violation of a PFA order. *Id.*, p. 2. Nevertheless, Judge Scanlon ultimately dismissed the charge against Pitchford because there was no actual PFA order entered against her with respect to the Cherevkas. *Id.*, p. 3. Thus, this case presents the rather straightforward question of whether a magistrate can have probable cause to issue an arrest warrant for an individual accused of violating a PFA order under circumstances in which no PFA order had actually been entered against that individual. The entry of such an order is, of course, a condition precedent to the commission of the offense. One who is not subject to a PFA order cannot commit the offense. In this case, Pitchford's commission of the charged offense was a legal impossibility. This distinguishes this particular determination from a more generalized probable cause determination, in which *anyone* could have potentially committed the charged offense. The statutory language which authorizes warrantless arrests for violations of PFA orders clearly contemplates that police officers will verify the existence of such orders before making such arrests. 23 Pa.C.S. § 6113(a)("The police officer may verify the existence of a protection order by telephone, radio or other electronic communication with the appropriate police department, Pennsylvania State Police registry, protection order file or issuing authority."). Moreover, the PFAA makes it clear that "[t]he registry of the Pennsylvania State Police shall be available at all times to inform courts, dispatchers and law enforcement officers of any valid protection order involving any defendant." 23 Pa.C.S. § 6105(e)(3). There is no indication that

the magistrate who issued the warrant for Pitchford's arrest was somehow unable to access the registry. Indeed, the magistrate who set Pitchford's bond at zero, which provided for her immediate release, apparently relied on the registry in order to determine that no PFA order was outstanding against her. Doc. No. 1, ¶¶ 40-42. The fact that probable cause determinations are routinely made on the basis of reasonable belief in the face of evidentiary uncertainty provides no justification for ignoring a statutory *condition precedent* to the commission of a crime, the presence or absence of which can be verified without delay by the issuing authority. The magistrate did not have probable cause to issue the warrant for Pitchford's arrest, and the Court does not understand the police officers in this case to argue otherwise.[7] Doc. No. 8, ¶ 19 (arguing that the officers merely executed a warrant that had been issued by a magistrate in the absence of their involvement). Hence, the Court's analysis proceeds with the understanding that the arrest warrant was unsupported by probable cause, and that it was issued erroneously.

The officers argue that they had probable cause to arrest Pitchford because the magistrate had issued a "facially valid warrant." Doc. No. 9, p. 6. They do not argue that the warrant was itself supported by probable cause. Pitchford argues that an erroneously issued warrant cannot

---

[7]By arguing that the *officers* had probable cause to arrest Pitchford *because* they were not permitted to disregard the magistrate's finding of probable cause, the Defendants implicitly concede that the *magistrate* did not have probable cause to issue the arrest warrant. Doc. No. 9, p. 10. The argument advanced by the officers is, of course, clearly foreclosed by precedent. *Berg v. County of Allegheny*, 219 F.3d 261, 269-270 (3d Cir. 2000)(explaining that an erroneously issued warrant cannot *provide* probable cause for an otherwise unlawful arrest). Even if the officers believe (without actually arguing) that the magistrate had probable cause to issue the arrest warrant on the basis of the order which had been entered by the Court of Common Pleas, the legal status of that order was essentially a legal question. The Court is not convinced (and the officers do not attempt to argue) that an erroneous *legal* determination by a magistrate can *create* probable cause for an arrest warrant. Since the parties now agree that the order was not a PFA order for purposes of the PFAA, it necessarily follows that the warrant was unsupported by probable cause. The plain language of the statute unambiguously contemplates that courts and police officers will verify the existence of the PFA order alleged to have been violated before authorizing or making an arrest. 23 Pa.C.S. § 6105(e)(3)("The registry of the Pennsylvania State Police shall be available at all times to inform courts, dispatchers and law enforcement officers of any valid protection order involving any defendant."); 23 Pa.C.S. § 6113(a)("The police officer may verify the existence of a protection order by telephone, radio or other electronic communication with the appropriate police department, Pennsylvania State Police registry, protection order file or issuing authority.").

*provide* probable cause for an otherwise unlawful arrest. Doc. No. 11, p. 9. A close examination of the relevant precedents reveals that the argument advanced by the officers has been rejected by both the United States Supreme Court and the United States Court of Appeals for the Third Circuit. This conclusion is confirmed by the following passage from the Supreme Court's decision in *Whiteley v. Warden, Wyoming State Penitentiary*, 401 U.S. 560 (1971):

> The State, however, offers one further argument in support of the legality of the arrest and search: the Laramie police relied on the radio bulletin in making the arrest, and not on Sheriff Ogburn's unnamed informant. Clearly, it is said, they had probable cause for believing that the passengers in the car were the men described in the bulletin, and, in acting on the bulletin, they reasonably assumed that whoever authorized the bulletin had probable cause to direct Whiteley's and Daley's arrest. To prevent arresting officers from acting on the assumption that fellow officers who call upon them to make an arrest have probable cause for believing the arrestees are perpetrators of a crime would, it is argued, unduly hamper law enforcement.
>
> We do not, of course, question that the Laramie police were entitled to act on the strength of the radio bulletin. Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid offered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest.
>
> In sum, the complaint on which the warrant issued here clearly could not support a finding of probable cause by the issuing magistrate. The arresting officer was not himself possessed of any factual data tending to corroborate the informer's tip that Daley and Whiteley committed the crime. Therefore, petitioner's arrest violated his constitutional rights under the Fourth and Fourteenth Amendments; the evidence secured as an incident thereto should have been excluded from his trial. *Mapp v. Ohio*, 367 U.S. 643 (1961).

*Whiteley*, 401 U.S. at 568-569 (footnote omitted). It is clear from the language in *Whiteley* that the *issuance* of an invalid warrant cannot *itself* provide probable cause for an otherwise unlawful arrest. *United States v. Hensley*, 469 U.S. 221, 231 (1985)("Thus *Whiteley* supports the proposition that, when evidence is uncovered during a search incident to an arrest in reliance merely on a flyer or bulletin, its admissibility turns on whether the officers who *issued* the flyer possessed probable cause to make the arrest.")(emphasis in original). In *Arizona v. Evans*, 514

U.S. 1, 14 (1995), the Supreme Court rejected the language in *Whiteley* which presupposed that the exclusionary rule was applicable, since later Supreme Court precedents have clarified that the underlying determination as to whether a Fourth Amendment violation has occurred is separate and distinct from the determination as to whether the suppression of illegally seized evidence is an appropriate remedy. *Hudson v. Michigan*, 126 S.Ct. 2159, 2163-2164 (2006)("Our cases show that but-for causality is only a necessary, not a sufficient, condition for suppression."); *United States v. Leon*, 468 U.S. 897, 922 (1984)("We conclude that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion."). Nevertheless, the Supreme Court made it clear in *Evans* that "*Whiteley* clearly retains relevance in determining whether police officers have violated the Fourth Amendment[.]" *Evans*, 514 U.S. at 13.

In *Berg v. County of Allegheny*, 219 F.3d 261, 269-270 (3d Cir. 2000), the United States Court of Appeals for the Third Circuit relied on *Whiteley* to hold that "an erroneously issued warrant cannot provide probable cause for an arrest." In so holding, the Court of Appeals rejected the District Court's conclusion that a facially valid (but genuinely invalid) warrant could *itself* provide the arresting constable with probable cause for making an arrest. *Berg*, 219 F.3d at 269-270. When officers execute a facially valid (but genuinely invalid) arrest warrant, the arrest is unsupported by probable cause unless there is something *other* than the warrant itself which justifies the arrest. *Whiteley*, 401 U.S. at 568-569 ("In sum, the complaint on which the warrant issued here clearly could not support a finding of probable cause by the issuing magistrate. The arresting officer was not himself possessed of any factual data tending to corroborate the informer's tip that Daley and Whiteley committed the crime."). If the *only* justification for an arrest is an invalid arrest warrant, the arrest constitutes an "unreasonable seizure" under the Fourth Amendment.[8] *Berg*, 219 F.3d at 271 ("Because the government officials who *issued* the

---

[8]The Court does not mean to suggest that officers' objectively reasonable reliance on an invalid warrant is of no significance. If officers acting in good faith rely on a subsequently invalidated search warrant in an objectively reasonable manner, the evidence obtained as a result of the search need not be excluded from evidence in a subsequent criminal trial. *United States v. Leon*, 468 U.S. 897, 922-926 (1984). The Supreme Court has analogized its decision not to

warrant here did not have probable cause to arrest Berg, the arrest violated the Fourth Amendment.")(emphasis added).  As noted earlier, the Court does not understand the officers to argue that the magistrate had probable cause to issue a warrant for Pitchford's arrest.  Moreover, there is no indication that the officers relied on anything *other* than the arrest warrant to justify the arrest.  Doc. No. 8, ¶ 19 (contending that the *officers* had probable cause to arrest Pitchford *because* there was a *facially* valid warrant for her arrest issued by the magistrate).  Consequently, the Court agrees with Pitchford's contention that her arrest constituted a constitutionally prohibited "unreasonable seizure" for the purpose of the Fourth Amendment.[9]  *Ott v. State*, 600 A.2d 111, 115 (Md. 1992)("Thus, while an officer may make an arrest on the strength of a

---

apply the exclusionary rule in certain instances with a finding that officers acting in good faith (under an objective reasonableness standard) are entitled to qualified immunity.  *Id.* at 922-923, n. 23.  A court's refusal to apply the exclusionary rule in a given case, like a finding that a defendant is entitled to qualified immunity, cannot be equated with a finding that the underlying search or seizure was constitutional.  The Defendants in this case have failed to recognize the distinction between the question of whether it was legal for them to arrest Pitchford and the question of whether they should be held personally liable for illegally arresting her.  Doc. No. 8, ¶¶ 18-20.

[9]In making this determination, the Court notes that the Supreme Court, in *Baker v. McCollan*, 443 U.S. 137 (1979), assumed *arguendo* that the warrant involved in that case conformed to the requirements of the Fourth Amendment.  *Baker*, 443 U.S. at 144 ("Respondent was indeed deprived of his liberty for a period of days, but it was pursuant to a warrant conforming, *for purposes of our decision*, to the requirements of the Fourth Amendment.")(emphasis added).  In *Baker*, there was no challenge to the validity of the warrant.  *Id.* at 143 ("Indeed, respondent makes clear that his § 1983 claim was based *solely* on Sheriff Baker's actions *after* respondent was incarcerated")(emphasis added).  Thus, *Baker* does not provide support for the officers' contention that they had genuine probable cause (rather than perceived probable cause) to arrest Pitchford.  The officers also rely on *Armstead v. Township of Upper Dublin*, 347 F.Supp.2d 188 (E.D.Pa. 2004).  In *Armstead*, however, the plaintiff apparently *conceded* that the arrest warrant had been based on probable cause, opting instead to argue that the arresting officer *executed* the warrant in the absence of probable cause.  *Armstead*, 347 F.Supp.2d at 194 ("In fact, plaintiff does not appear to argue that the warrant was issued without probable cause at all.  Rather, plaintiff alleges that Officer Lebby *executed* the warrant without probable cause, despite the existence of a valid warrant supported by probable cause, because he in fact knew that plaintiff did not own the vehicles in question.")(emphasis added).  Pitchford clearly contends that the arrest warrant was *itself* invalid, and the Court finds that her arguments which distinguish *Armstead* are persuasive.  Doc. No. 11, pp. 11-13.

16

warrant, the existence of which has been certified to him by other officers in his department, if the officers who obtained the warrant did not possess sufficient information or evidence to establish probable cause, the arrest based on the warrant is illegal.").

"The essential predicate for a § 1983 claim for unlawful arrest is the absence of probable cause." *Forest v. Pawtucket Police Department*, 290 F.Supp.2d 215, 230 (D.R.I. 2003). Pitchford properly alleges this "essential predicate." The question of whether the officers can be held liable for the constitutional violation, however, is more complicated. The officers argue that their failure to check the PFA registry before arresting Pitchford sounds in negligence, and that negligence is not actionable under § 1983. Doc. No. 9, p. 10, n. 4. This argument is simply wrong. In *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), the Supreme Court held that "§ 1983 affords a 'civil remedy' for deprivations of federally protected rights caused by persons acting under color of state law without any express requirement of a particular state of mind." The Supreme Court also determined that a state actor's negligent conduct could effect a "deprivation" within the meaning of the Due Process Clause of the Fourteenth Amendment. *Parratt*, 451 U.S. at 536-537 ("Unquestionably, respondent's claim satisfies three prerequisites of a valid due process claim: the petitioners acted under color of state law; the hobby kit falls within the definition of property; and the alleged loss, *even though negligently caused*, amounted to a deprivation.")(emphasis added). Both of these issues were reexamined in *Daniels v. Williams*, 474 U.S. 327 (1986). In *Daniels*, the Supreme Court reaffirmed its prior determination that § 1983 contains no state-of-mind requirement. *Daniels*, 474 U.S. at 329-330 ("In *Parratt v. Taylor*, we granted certiorari, as we had twice before, 'to decide whether mere negligence will support a claim for relief under § 1983.' 451 U.S., at 532. After examining the language, legislative history, and prior interpretations of the statute, we concluded that § 1983, unlike its criminal counterpart, 18 U.S.C. § 242, contains no state-of-mind requirement independent of that necessary to state a violation of the underlying constitutional right. *Id.*, at 534-535. *We adhere to that conclusion.*")(emphasis added). The Supreme Court went on to overrule *Parratt* to the extent that it held that "mere lack of due care by a state official may 'deprive' an individual of life, liberty, or property under the Fourteenth Amendment." *Daniels*, 474 U.S. at 330-331. The language in *Daniels* indicating that the plaintiff could not proceed on the basis of the defendant's

negligence dealt with the need to establish an underlying constitutional violation, not the need to establish liability under § 1983. *Id.* at 330 ("But in any given § 1983 suit, the plaintiff must still prove a violation of the underlying constitutional right; and *depending on the right*, merely negligent conduct *may* not be enough to state a claim.")(emphasis added). Negligent conduct by state officials does not effect a "deprivation" within the meaning of the Due Process Clause. *Davidson v. Cannon*, 474 U.S. 344, 348 (1986)("As we held in *Daniels*, the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials."). For the purpose of the instant case, that is inconsequential. The Court has already concluded that Pitchford has properly alleged an underlying violation of the Fourth Amendment (i.e., that she was unreasonably "seized" pursuant to an invalid warrant), so *Daniels* provides no support for the arguments advanced by the officers. Where negligence is sufficient to establish an underlying violation of federal law, negligence is sufficient to establish liability under § 1983.[10] *Board of County Commissioners v. Brown*, 520 U.S. 397, 405 (1997)("Section 1983 itself contains no state-of-mind requirement independent of that necessary to state a violation of the underlying federal right.")(internal quotation marks omitted). The officers' belief to the contrary is in error.

A constitutional violation having been established, it remains to be determined which, if any, of the officers are entitled to qualified immunity. The Supreme Court has made it clear that state officials can be on notice that their conduct violates clearly established federal law even under a novel set of facts. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). The Court recognizes that

---

[10]The Court acknowledges that some courts have confused these distinct inquiries and held, incorrectly, that negligent conduct is not actionable under § 1983. *Uram v. County of Allegheny*, 567 A.2d 753, 757 (Pa.Commw.Ct. 1989)("More than negligent conduct is required to state a claim under § 1983."). Perhaps that is why the officers believe that negligence is not actionable under § 1983. Doc. No. 9, p. 10, n. 4 ("Plaintiff's allegations in this respect sound in negligence, which is not actionable under § 1983."). In any event, the question of liability under § 1983 is distinct from the question of whether an underlying violation of federal law can be established, and the argument advanced by the officers confuses these two issues. A careful reading of *Daniels v. Williams*, 474 U.S. 327 (1986), confirms that the officers' argument is not correct. *Daniels*, 474 U.S. at 330 ("But in any given § 1983 suit, the plaintiff must still prove a violation of the underlying constitutional right; and *depending on the right*, merely negligent conduct *may* not be enough to state a claim.")(emphasis added).

"general statements of law are not inherently incapable of giving fair and clear warning[.]" *United States v. Lanier*, 520 U.S. 259, 271 (1997). In order for a federally protected right to be "clearly established" for the purpose of a qualified immunity inquiry, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*." *Saucier*, 533 U.S. at 202 (emphasis added). With that in mind, the Court now turns to the allegations against Ilgenfritz, Garcia, Curtain and Chereb.

Pitchford alleges that Ilgenfritz arrived at the Cherevka residence shortly after the Cherevkas complained to the Police Department about Pitchford's alleged violation of a PFA order. Doc. No. 1, ¶ 10. When the Cherevkas presented Ilgenfritz with the purported PFA order (which all parties now concede was not an actual PFA order), he advised Kathy Jo to go to "night court" in order to file a private criminal complaint under § 6113.1(a). *Id.*, ¶ 15. He apparently did so without reviewing the PFA registry to verify that a PFA order had, in fact, been entered against Pitchford. *Id.*, ¶ 16. The issuance of the arrest warrant, of course, resulted from the representations made by Daniel to the magistrate. *Id.*, ¶¶ 17-19.

It is worth noting that Ilgenfritz, unlike his three colleagues named in this lawsuit, did not "seize" Pitchford. The arrest was carried out by Garcia, Curtain and Chereb. *Id.*, ¶¶ 20-21. Hence, it is arguable that no action of Ilgenfritz "subjected" Pitchford to a "deprivation" of a federally protected right within the meaning of § 1983. Although § 6113(a) permits police officers to make warrantless arrests (upon probable cause) for violations of PFA orders, Ilgenfritz did not seek to arrest Pitchford himself. Had he arrested Pitchford himself, without a warrant and without checking the PFA registry to confirm the existence of a PFA order against her, the Court would have little trouble in concluding that he violated a clearly established right of which a reasonable officer would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Indeed, the plain language of the statutory provision contemplates that officers will verify the existence of the particular PFA order alleged to have been violated before making such a warrantless arrest. 23 Pa.C.S. § 6113(a)("The police officer may verify the existence of a protection order by

telephone, radio or other electronic communication with the appropriate police department, Pennsylvania State Police registry, protection order file or issuing authority."). Ilgenfritz, however, did *not* arrest Pitchford. Instead, he referred the Cherevkas to the night court magistrate, thereby allowing the matter to be heard and determined by an impartial adjudicatory officer charged with the duty and responsibility to make probable cause determinations. Doc. No. 1, ¶¶ 10-16. To the extent that Pitchford believes that Ilgenfritz violated her constitutional rights by having referred her adversaries to an impartial adjudicator, she is mistaken. If anything, Ilgenfritz *refrained* from engaging in potential constitutional violations when he declined to pursue a warrantless arrest on his own. It was not Ilgenfritz's responsibility to verify the existence of a PFA order against Pitchford, since he simply suggested that the Cherevkas may pursue the matter on their own. It is true that "a government official's liability for causing an arrest is the same as for carrying it out." *Berg*, 219 F.3d at 272. Nevertheless, Ilgenfritz did not *cause* Pitchford's arrest and he was under no duty to check the PFA registry under the circumstances at the time.

The Court assumes, as it must, that the allegations contained in the complaint are true. *Tellabs*, 127 S.Ct. at 2509. Even if everything alleged by Pitchford is true, Ilgenfritz committed no constitutional violation. He neither seized Pitchford nor participated in the case against her. He merely told the Cherevkas where to go if they wished to pursue the matter on their own.[11] Since Ilgenfritz violated no federally protected right of Pitchford, he is entitled to qualified immunity regardless of whether Pitchford's "asserted right" is clearly established. *Chavez v. Martinez*, 538 U.S. 760, 766 (2003)(plurality opinion). Therefore, Count I of the complaint must be dismissed with respect to Ilgenfritz without further inquiry.

---

[11]It makes no difference whether Ilgenfritz, as Pitchford now claims, told her that he had personally reviewed the document which the Cherevkas presented as a PFA order. Doc. No. 11, p. 5. Regardless of what Ilgenfritz subjectively believed about the legal effect of the court order, it is clear that he did nothing more than instruct the Cherevkas that they could pursue the matter before a magistrate. Ilgenfritz did not determine that probable cause existed for an arrest. Instead, he referred the Cherevkas to an adjudicatory officer charged with the duty of making such determinations. He did nothing illegal. Pitchford expresses a willingness to amend her complaint to incorporate her conversation with Ilgenfritz. Doc. No. 11, p. 5, n. 2. Such an amendment would be futile, since it would not defeat Ilgenfritz's qualified immunity defense.

The allegations against Garcia, Curtain and Chereb do establish a constitutional violation. It is alleged that they affirmatively participated in the arrest of Pitchford (i.e., they "seized" her for purposes of the Fourth Amendment). Doc. No. 1, ¶¶ 20-31. Since the *only* basis for this arrest was an arrest warrant that was not supported by probable cause, the arrest was unconstitutional. *Whiteley*, 401 U.S. at 568-569; *Berg*, 219 F.3d at 269-271; *State v. Taylor*, 621 A.2d 1252, 1255 (R.I. 1993)("In the instant case the fact that Officer Malloy relied upon the belief that the Cranston warrant was constitutionally sufficient cannot sustain the arrest."). For the purpose of the qualified immunity inquiry, the dispositive question is whether "a reasonable officer [in the position of Garcia, Curtain or Chereb] could have believed that his or her conduct was lawful, in light of the clearly established law and the information in the officer's possession." *Sharrar v. Felsing*, 128 F.3d 810, 826 (3d Cir. 1997). The governing precedents recognize that this inquiry is an objective one, and that Pitchford cannot defeat the officers' qualified immunity defense unless she can establish that a "reasonably well trained officer would have known that the [arrest] was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922-923, n. 23.

In support of her position that the officers are not entitled to qualified immunity, Pitchford calls the Court's attention to the language used by the Court of Appeals in *Berg*. Doc. No. 11, pp. 14-15. In *Berg*, the Court of Appeals explained that it had "generally extended immunity to an officer who makes an arrest based on an objectively reasonable belief that there is a valid warrant." *Berg*, 219 F.3d at 273. The Court of Appeals went on to state as follows:

> Nevertheless, an apparently valid warrant does not render an officer immune from suit if his reliance on it is unreasonable in light of the relevant circumstances. Such circumstances include, but are not limited to, other information that the officer possesses or to which he has reasonable access, and whether failing to make an immediate arrest creates a public threat or danger of flight.

*Berg*, 219 F.3d at 273. Pitchford contends that Garcia, Curtain and Chereb acted unreasonably in arresting her pursuant to the invalid warrant because they had "reasonable access" to the PFA registry, and because their failure to make an immediate arrest would not have created "a public threat or danger of flight." Doc. No. 11, pp. 14-15.

While the language in *Berg* lends support to Pitchford's argument, it must be remembered

that the language in any particular judicial opinion is best understood by reference to the particular factual context in which it was written. *Schanou v. Lancaster County School District No. 160*, 62 F.3d 1040, 1045 (8th Cir. 1995). In *Berg*, a constable arrested someone for a parole violation who had been mistakenly named in an arrest warrant because of a clerical error. *Berg*, 219 F.3d at 266-268. The individual who was arrested was no longer on parole. *Id.* at 267. The constable initially traveled to the last known address of the individual who was supposed to have been named in the warrant, only to find an abandoned house. *Id.* After speaking with the person who he would eventually arrest over the telephone, the constable traveled for more than an hour for the purpose of locating him. *Id.* When the constable arrived at the person's residence, he encountered evidence indicating that the person named in the warrant was no longer on parole and, hence, could not have violated the conditions of his parole. *Id.* ("Berg did show Wolfgang his driver's license, confirming that Berg was no longer on parole."). The constable nevertheless executed the arrest warrant, apparently motivated by a desire for the fee that he received for each person arrested. *Id.* at 267-268 ("But Wolfgang simply told Berg not to take too much time retrieving the release documents because he had three more people to arrest that night."). Although the warrant had been generated on August 3, 1994, it was not executed until December 30, 1994. *Id.* at 266-267. Given the age of the warrant, the discrepancy concerning the address, the evidence that the individual had already completed his parole, and the fact that the individual did not seek to evade the constable's efforts to locate him, the Court of Appeals determined that there were "valid questions" concerning the reasonableness of the constable's conduct. *Id.* at 273.

This case is clearly distinguishable from *Berg*. The arrest warrant executed by Garcia, Curtain and Chereb had just been issued approximately sixteen hours before their arrival at Pitchford's residence. Doc. No. 1, ¶¶ 17, 20. The age of the warrant gave the officers no reason to hesitate. The arresting officers did not encounter a discrepancy concerning the address of the person named in the warrant akin to that which had been encountered by the arresting constable in *Berg*. After checking Pitchford's driver's license to verify her identity, Garcia arrested Pitchford. *Id.*, ¶¶ 20-21. Pitchford's only basis for contending that the officers acted in an objectively unreasonable manner was their failure to check the PFA registry for the purpose of

22

verifying that a PFA order had been entered against her. *Id.*, ¶ 22. The Court is not convinced that *Berg* requires the denial of the officers' motion to dismiss. Garcia, Curtain and Chereb did nothing that could be characterized as objectively unreasonable. They executed a facially valid (though genuinely invalid) arrest warrant that had recently been issued by a magistrate. They encountered no direct evidence that a PFA order could not have been in effect (unlike the constable in *Berg*, who encountered direct evidence indicating that the person named in the warrant was no longer on parole), nor did they have any other reason to question the validity of the arrest warrant. The objectively reasonable nature of the officers' conduct, of course, does not negate the illegality of the arrest itself. *Berg*, 219 F.3d at 269-270; *Taylor*, 621 A.2d at 1255; *Ott*, 600 A.2d at 115. It does, however, entitle Garcia, Curtain and Chereb to the defense of qualified immunity. They did not make a warrantless arrest. Thus, they had no duty under § 6113(a) to independently verify the existence of the PFA order alleged to have been violated. 23 Pa.C.S. § 6113(a). The ease with which they could have checked the PFA registry militates in favor of Pitchford's argument to some extent, but it also provides countervailing force to the officers' argument. Police officers executing an arrest warrant on the basis of an alleged PFA violation may readily assume that a magistrate would not issue such a warrant without taking the meager step of verifying the existence of the PFA order alleged to have been violated, and the Court does not believe that such an assumption is objectively unreasonable.[12] The fact that no such verification occurred in this case was the fault of the magistrate, not the fault of the officers.

The Court acknowledges that Pitchford appears to allege that the officers, after her arrival at the Munhall Police Station, became subjectively aware of the fact that no PFA order had ever

---

[12]This case is distinguishable from *Berg v. County of Allegheny*, 219 F.3d 261 (3d Cir. 2000), for yet another reason. In *Berg*, the District Court had not decided the question of qualified immunity, since it had erroneously concluded that the underlying arrest had been legal. *Berg*, 219 F.3d at 269-274. Thus, the Court of Appeals remanded the case to the District Court so that the issue could be examined in light of the fact that the arrest had been unconstitutional. *Id.* at 273-274. The Court acknowledges Pitchford's argument that the dismissal of her claims against the officers at this stage in the litigation would be premature. Doc. No. 11, p. 16. Nonetheless, the Supreme Court has made it clear that the issue of qualified immunity should be resolved at the earliest possible stage in the litigation, and the Court is convinced that the officers are entitled to qualified immunity under the facts alleged in the complaint. *Scott v. Harris*, 127 S.Ct. 1769, 1773, n. 2 (2007).

been entered against her. Doc. No. 1, ¶ 29. One of the officers allegedly exclaimed, "We have to let her go." *Id.* The officers rely on *Baker v. McCollan*, 443 U.S. 137 (1979), for the proposition that authorities are not required the investigate the claims of innocence made by a person who has been legally arrested. Doc. No. 13, p. 5. This argument erroneously presupposes that Pitchford was *legally* arrested. As the Court has already determined, her arrest was unconstitutional, since the officers arrested her *solely* on the basis of an invalid warrant. *Baker* was decided on the assumption that the underlying arrest had been legal. *Baker*, 443 U.S. at 145-146, ("Given the requirements that arrest be made only on probable cause and that one detained be accorded a speedy trial, we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent."). Indeed, it was *conceded* in *Baker* that the arrest had been made in conformity with the Fourth Amendment. *Id.* at 144 ("Respondent was indeed deprived of his liberty for a period of days, but it was pursuant to a warrant conforming, *for purposes of our decision*, to the requirements of the Fourth Amendment.")(emphasis added). Thus, the officers' reliance on *Baker* is problematic in light of the fact that the warrant for Pitchford's arrest was unsupported by probable cause. *Berg*, 219 F.3d at 271, n. 6 ("At issue here is not whether authorities must investigate the claims of innocence of a person who has been *legally* arrested but what precautions the Constitution requires before an arrest warrant is issued and executed.")(emphasis added).

Pitchford's complaint, however, does not appear to be based on the theory advanced by the plaintiff in *Baker*. It is clear that Count I is based on the Fourth Amendment. Doc. No. 1, ¶¶ 50-54. Although the Fourth Amendment's probable cause requirement informed the Supreme Court's inquiry in *Baker*, that case was brought solely on the basis of the Due Process Clause of the Fourteenth Amendment. *Baker*, 443 U.S. at 142 ("Because respondent's claim and the Court of Appeals' decision focus *exclusively* on respondent's prolonged detention caused by petitioner's failure to institute adequate identification procedures, the constitutional provision allegedly violated by petitioner's action is presumably the Fourteenth Amendment's protection against deprivations of liberty without due process of law.")(emphasis added). Since no due process claim of the type contemplated by the Supreme Court in *Baker* is at issue in this case,

there is no need for the Court to tackle the qualified immunity inquiry from that angle.

Pitchford may believe that the officers' continued detention of her, after they allegedly became subjectively aware of the fact that no PFA order had been entered against her, belies any contention that the officers acted with an objectively reasonable belief that their actions were lawful. The qualified immunity inquiry, however, cannot be conducted in a vacuum. It is context-specific. *Saucier*, 533 U.S. at 200. Pennsylvania law provides that a defendant charged with violating a PFA order "shall be afforded a preliminary arraignment without unnecessary delay." 23 Pa.C.S. § 6113(d). Pitchford was released immediately after her arraignment hearing, and she was apparently detained for only about ten hours. Doc. No. 1, ¶¶ 20, 37-42. It was not objectively unreasonable for the officers to wait for an adjudicatory officer to sort out the discrepancy between the magistrate's issuance of an arrest warrant and their own inability to verify the existence of the underlying PFA order alleged to have been violated. This is especially true in light of the fact that the officers played no role in the procurement of the arrest warrant. It would, of course, be different if the officers had themselves made affirmative representations to the magistrate concerning the issue of probable cause. *Wilson v. Russo*, 212 F.3d 781, 786-787 (3d Cir. 2000). Nonetheless, in this case, the only misrepresentations alleged to have been made were made by the Cherevkas, not by the officers. Doc. No. 1, ¶ 19 ("Upon information and belief, the Cherevkas intentionally and/or recklessly provided the above-described incorrect information to the Munhall Borough Police and to the night court magistrate in order to cause Ms. Pitchford's unlawful arrest and detention, and to cause Ms. Pitchford emotional distress."). Imposition of liability upon the officers in a case such as this would "dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties." *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949), cert. denied, 339 U.S. 949 (1950). Even when viewed in the light most favorable to Pitchford, the actions of the officers named in this lawsuit were not objectively unreasonable. They are entitled to qualified immunity, and Count I of Pitchford's complaint must be dismissed. Doc. No. 1, ¶¶ 49-56.

Munhall seeks the dismissal of Count II of the complaint, which asserts a claim of municipal liability under § 1983. Doc. No. 8, ¶ 21. Munhall seeks the dismissal of Count II on

the ground that Pitchford fails to allege an underlying constitutional violation.[13]  *Id.*  At this stage, the Court clearly cannot dismiss Count II for that reason, since it has already been determined that Pitchford *does* allege a constitutional violation (i.e., an unreasonable "seizure" proscribed by the Fourth Amendment).  Hence, the issue of Munhall's liability requires a more detailed examination.

It is undisputed that Munhall is a "person" for purposes of § 1983.  *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 690 (1978).  Although the Court does not believe that Garcia, Curtain and Chereb deserve the blame for Pitchford's unconstitutional arrest, they are the ones who actually "seized" her.  Moreover, Munhall cannot avail itself of the qualified immunity available to the officers.  *Owen v. City of Independence*, 445 U.S. 622, 638-657 (1980).  Nevertheless, there is no *respondeat superior* liability under § 1983.  *Monell*, 436 U.S. at 691.  Thus, Pitchford must do more than show that Munhall employed tortfeasors in order to establish the existence of § 1983 liability.  *Id.*

In *Board of County Commissioners v. Brown*, 520 U.S. 397 (1997), the Supreme Court delineated a standard for municipal liability under § 1983 requiring a rigorous examination of the issue of causation.  To hold Munhall liable for the actions of the officers who illegally arrested her, Pitchford must "demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged."  *Brown*, 520 U.S. at 404.  This means that she "must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a *direct causal link* between the municipal action and the deprivation of federal rights."  *Id.* (emphasis added).

The Defendants devote a portion of their reply brief to an explanation of why *Whiteley* and *Berg* do not control this case.  Doc. No. 13, p. 4.  They contend that since any misrepresentations made to the magistrate by the Cherevkas cannot be attributed to the officers, the arrest of Pitchford was constitutionally permissible.  *Id.*  As the Court has already explained,

---

[13]The parties agree that Pitchford cannot recover punitive damages from Munhall, since the Supreme Court's decision in *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 263-271 (1981), held that municipalities are not liable for punitive damages in suits brought under § 1983.  Doc. Nos. 8, ¶ 22, 12, ¶ 22.

this argument is unavailing with respect to the underlying constitutional issue, since the officers had no basis aside from the arrest warrant itself to take Pitchford into custody. *Whiteley*, 401 U.S. at 568. Regardless of *who* made representations to the magistrate concerning the legal status of the order which had been entered by the Court of Common Pleas, it is clear that the magistrate issued an arrest warrant on the basis of Pitchford's alleged violation of a PFA order which did not exist, and that the absence of a PFA order could have been easily ascertained by reference to the PFA registry created by § 6105(e). Doc. No. 8-2, pp. 1-3. It is undisputed that the warrant should not have been issued. It is also clear that "an erroneously issued warrant cannot provide probable cause for an arrest." *Berg*, 219 F.3d at 269-270. Hence, there is no merit to the Defendants' argument that *Whiteley* and *Berg* do not control this case. Nonetheless, this argument does have merit with respect to a distinct issue (i.e., the chain of causation between Munhall's alleged failure to train its officers about the PFA registry and the unlawful arrest of Pitchford).

To prevent municipal liability for Munhall's alleged failure to ensure that its police officers were acting within constitutionally mandated boundaries "from collapsing into *respondeat superior* liability," the Court must "carefully test the link" between the alleged inadequacies of Munhall's actions and the particular injury alleged by Pitchford. *Brown*, 520 U.S. at 410 (emphasis in original). The relevant portion of Count II alleges:

58. Upon information and belief, the Borough of Munhall has encouraged, tolerated, ratified and/or has been deliberately indifferent to the following patterns, practices and customs and to the need for more or different training, supervision or discipline in the areas of:

a. the abuse of police powers, including but not limited to false arrest, false imprisonment and unlawful detention;

b. the failure of police officers to follow established policies and procedures regarding the confirmation of the existence of a valid PFA in the statewide registry before placing a suspect under arrest or recommending that a warrant be issued for a suspect;

c. the failure to provide proper training and supervision of its police officers regarding the Protection from Abuse Act, as is required under 23 Pa. C.S. § 6105(a), including the confirmation of an active PFA using the

statewide registry before the arrest and detention of a suspect and the need for accurate and current information in the statewide registry;

d.  the failure of police officers to prevent, deter, report or take action against the unlawful conduct of other officers under such circumstances as presented herein.

Doc. No. 1, ¶ 58.  Since the officers who "seized" Pitchford were merely executing an arrest warrant which (unbeknownst to them) turned out to be invalid, Pitchford's arrest does not strike the Court as an "abuse of police powers."  *Id.*, ¶¶ 20-21.  Ilgenfritz did not *recommend* that a warrant *be issued* for Pitchford's arrest.  He only advised the Cherevkas to seek such a warrant on their own.  *Id.*, ¶ 15.  No Munhall police officer made a warrantless arrest under § 6113(a).  Hence, any alleged failure on the part of Munhall to train its officers about the PFA registry could not have caused the unconstitutional arrest of Pitchford.  A municipality cannot reasonably be expected to require its officers to investigate the underlying bases for an apparently valid arrest warrant issued by a neutral magistrate under circumstances in which those officers played no role in the actual procurement of such warrant.

The alleged misrepresentations made by the Cherevkas concerning the legal status of the order entered by the Court of Common Pleas, coupled with the magistrate's issuance of an arrest warrant without having verified the existence of the PFA order believed to have been violated, clearly served to break the chain of causation between the alleged failures of Munhall and the constitutional injury suffered by Pitchford.  Under these circumstances, it cannot be said that Munhall, "through its *deliberate* conduct," was "the 'moving force' behind the injury alleged." *Brown*, 520 U.S. at 404 (emphasis in original).  Pitchford cannot establish municipal liability under § 1983 on such an attenuated basis.  Count II of her complaint must be dismissed.  Doc. No. 1, ¶¶ 57-62.

The motions to dismiss filed in this case do not constitute responsive pleadings for the purpose of Federal Rule of Civil Procedure 15(a).  *Centifanti v. Nix*, 865 F.2d 1422, 1431, n. 9 (3d Cir. 1989).  Therefore, until today, Pitchford has been free to amend her complaint "once as a matter of course[.]" *Fed. R. Civ. P. 15(a)*.  Nevertheless, this Court adheres to its decision earlier this year in *Tish v. Magee-Women's Hospital*, 2007 WL 1221137, at *3-5, 2007 U.S. Dist.

LEXIS 30130, at *9-15 (W.D.Pa. April 24, 2007), which held that the right to amend "as a matter of course" terminates when a district court dismisses claims in a pleading pursuant to a Rule 12(b)(6) motion. As a consequence of this Court's decision to dismiss Counts I and II of Pitchford's complaint, she can now amend her complaint "only by leave of court or by written consent of the adverse party[.]" *Fed. R. Civ. P. 15(a).* The United States Court of Appeals for the Third Circuit has held that leave to amend should be granted unless a denial is justified on a ground such as undue delay, bad faith, dilatory motive, prejudice, or futility. *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000). Pitchford seeks leave to amend her complaint to include an allegation concerning a conversation that she had with Ilgenfritz concerning the order which had been entered by the Court of Common Pleas. Doc. No. 11, p. 5, n. 2. She claims that Ilgenfritz told her that he had reviewed the order before advising the Cherevkas to file a private criminal complaint under § 6113.1. *Id.*, p. 5.

The Court is not convinced that the proposed amendment to the complaint would make a dispositive difference. The order issued by the Court of Common Pleas is before the Court, and it certainly bears a reasonable resemblance to a PFA order. Doc. No. 14. Perhaps that is why the magistrate ultimately issued a warrant for Pitchford's arrest without checking the registry established by § 6105(e). Regardless of what Ilgenfritz *believed*, he did not *make* a probable cause determination himself. Instead, he simply referred the Cherevkas to the adjudicatory process established under Pennsylvania law. Since Ilgenfritz made no warrantless arrest under § 6113(a), he was under no duty to independently verify that the order presented to him by the Cherevkas was, in fact, a valid PFA order. That determination was for the magistrate to make, since it was the magistrate who made the probable cause determination (which, in this case, turned out to not be accurate). It would be futile to permit Pitchford to amend her complaint to include this allegation. Moreover, Pitchford has made very specific allegations in her complaint, and the Court is convinced that no plausible amendment would be sufficient to either defeat the officers' entitlement to qualified immunity or link the chain of causation between Munhall's alleged failures and Pitchford's constitutional injury. Hence, leave to amend will not be granted.

Count III alleges that Garcia, Curtain and Chereb committed the tort of false arrest, and Count IV alleges that they, along with Ilgenfritz, committed the tort of false imprisonment. Doc.

No. 1, ¶¶ 63-73. They move for the dismissal of these claims as well, but they do so pursuant to their erroneous assumption that Pitchford was legally arrested. Doc. No. 9, p. 10 ("Since the police officers had probable cause to arrest Plaintiff based on the facially valid warrant issued by the magistrate, Plaintiff's state law false arrest and false imprisonment claims must be dismissed with prejudice."). As the Court has already made clear, Pitchford's arrest was not constitutional. Therefore, Counts III and IV cannot be dismissed on the ground advanced by the officers. There is, however, no need for the Court to discuss these claims on the merits. Having determined that Pitchford's federal claims must be dismissed, the Court will decline to exercise supplemental jurisdiction over Counts III and IV pursuant to 28 U.S.C. § 1367(c)(3). *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)(explaining that, where the claims over which a district court has original jurisdiction are dismissed before trial, the district court should decline to exercise jurisdiction over the remaining state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for the continued exercise of federal adjudicatory jurisdiction).

The Court's decision to not exercise supplemental jurisdiction over Pitchford's false arrest and false imprisonment claims, of course, does not deprive her of the remedies to which she may be entitled under Pennsylvania law. Since her arrest occurred on April 23, 2005, her claims would now be subject to the two-year statute of limitations established by 42 Pa.C.S. § 5524(1). Doc. No. 1, ¶ 20. If Pitchford's state claims were truly barred by § 5524(1), this Court's decision not to adjudicate them would be an abuse of discretion. *Hedges v. Musco*, 204 F.3d 109, 122-124 (3d Cir. 2000). Nevertheless, Congress has addressed this problem by enacting 28 U.S.C. § 1367(d), which provides:

> The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

28 U.S.C. § 1367(d). In *Jinks v. Richland County*, 538 U.S. 456, 461 (2003), the Supreme Court held that § 1367(d) was a valid exercise of Congress' constitutional authority to "To make all Laws which shall be necessary and proper for carrying into Execution" its power "To constitute

Tribunals inferior to the supreme Court[.]" U.S. CONST. art. I, § 8. Thus, the Pennsylvania courts must comply with § 1367(d). There is no need for the Court to consider whether Pennsylvania law "provides for a longer tolling period[,]" since the 30-day safe harbor established by Congress ensures that Pitchford will have sufficient time to refile her false arrest and false imprisonment claims in a Pennsylvania court if she chooses to do so. The questions concerning the requirements for establishing liability under these theories and the immunities to which the officers may be entitled under Pennsylvania law would be more appropriately addressed by a Pennsylvania court. The Court will decline to exercise supplemental jurisdiction over these claims. The motion to dismiss filed by the officers will be denied without prejudice as to Counts III and IV, and these claims will be dismissed without prejudice. Nothing in this opinion should be construed to preclude Pitchford from pursuing her state claims in a Pennsylvania court of competent jurisdiction.

Counts V and VI allege that the Cherevkas committed the torts of false imprisonment and intentional infliction of emotional distress. Doc. No. 1, ¶¶ 74-81. These claims are properly before the Court at this time, since § 1367(a) clearly provides that a federal court's supplemental jurisdiction "shall include claims that involve the joinder or intervention of additional parties." 28 U.S.C. § 1367(a). The Cherevkas have filed a motion to dismiss Pitchford's claims against them. Doc. No. 14. Nevertheless, since it has already been determined that Pitchford's federal claims must be dismissed, the Court will decline to exercise supplemental jurisdiction over her claims against the Cherevkas pursuant to § 1367(c)(3). It would clearly be imprudent for this Court to tackle these issues of Pennsylvania law in the absence of federal claims. The Cherevkas' motion to dismiss will be denied without prejudice, and Counts V and VI will be dismissed without prejudice. Since these claims have been pending in this Court until today, they are also protected by the 30-day safe harbor established by § 1367(d). Pitchford remains free to pursue her claims against the Cherevkas in a Pennsylvania court of competent jurisdiction, and nothing in this opinion should be construed to indicate otherwise.

## Conclusion

The Court construes Pitchford's complaint in a "plausible" manner, assuming that all of the allegations contained therein are true. *Bell Atlantic Corporation*, 127 S.Ct. at 1974; *Tellabs*,

127 S.Ct. at 2509. Pitchford was "seized" within the meaning of the Fourth Amendment, since her freedom of movement was terminated by governmental actors "through means intentionally applied." *Brower*, 489 U.S. at 844 (emphasis omitted). Although the officers apparently believed that the magistrate had probable cause to issue a warrant for Pitchford's arrest, "the contrary turn[ed] out to be true[.]" *Whiteley*, 401 U.S. at 568; *Berg*, 219 F.3d at 270. The officers had no other basis for arresting Pitchford, and their *sole* reason for taking her into custody was an invalid arrest warrant. *Whiteley*, 401 U.S. at 568 ("The arresting officer was not himself possessed of any factual data tending to corroborate the informer's tip that Daley and Whiteley committed the crime."). The arrest was, therefore, an "unreasonable seizure" within the meaning of the Fourth Amendment, which is applicable to Pennsylvania's political subdivisions via the Due Process Clause of the Fourteenth Amendment. *Pringle*, 540 U.S. at 369. Nevertheless, it would not have been clear to a reasonable officer in the position of Garcia, Curtain or Chereb that the "seizure" of Pitchford was unconstitutional.[14] *Saucier*, 533 U.S. at 202. For this reason, the arresting officers are entitled to qualified immunity. Ilgenfritz did not "seize" Pitchford, nor did his actions directly *cause* her to be "seized." Hence, he did not "subject" Pitchford to the

---

[14]The complaint is most plausibly read to allege that the officers arrested Pitchford without checking to see whether a PFA order had been entered against her. Doc. No. 1, ¶ 53 ("Officers Garcia, Chereb and Curtain knew or *should have known* that they were without probable cause to arrest and detain Ms. Pitchford.")(emphasis added). The Court does not address Counts III and IV on the merits, since the Court declines to exercise supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367(c)(3). It is, however, worth noting that in Counts III and IV, Pitchford alleges that Garcia, Curtain and Chereb "recognized their actions as misconduct and acted with the intention of carrying out a wrongful purpose." *Id.*, ¶¶ 65, 72. Since these allegations are not included under Counts I and II, the Court need not address them directly. To the extent that these allegations should inform the Court's inquiry as to Counts I and II because they relate to an event common to all six counts contained in the complaint, the Court believes them to be "bald assertions" that are inconsistent with the factual allegations contained in the body of the complaint. *Id.*, ¶ 22 (basing Pitchford's claims against Garcia, Curtain and Chereb on their alleged failure to verify the existence of a PFA order before executing the arrest warrant); *Morse v. Lower Merion School District*, 132 F.3d 902, 906 (3d Cir. 1997)("[A] court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss."). No plausible reading of the complaint supports Pitchford's assertion that the officers acted "maliciously," since the complaint alleges only that they acted on the basis of a facially valid arrest warrant. Doc. No. 1, ¶ 55.

"deprivation" of a right protected by federal law.  42 U.S.C. § 1983.  Moreover, the chain of causation between Munhall's alleged failures and the constitutional injury suffered by Pitchford is much too attenuated to support a determination that Munhall's *deliberate conduct* was the *moving force* behind the unconstitutional arrest alleged in the complaint.  *Brown*, 520 U.S. at 404.  Munhall cannot be held liable under § 1983 solely on the basis of *respondeat superior*.  *Monell*, 436 U.S. at 691.  Consequently, Munhall is not liable for the unconstitutional "seizure" alleged by Pitchford.  Counts I and II must be dismissed.  Doc. No. 1, ¶¶ 49-62.  Because Pitchford has pleaded with sufficient specificity to inform the Court of the precise factual circumstances alleged in the complaint, and because the specific amendment suggested in her brief would not change the disposition in this case, the Court is convinced that any attempt on her part to amend the complaint would be futile.  *Shane*, 213 F.3d at 115 ("'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted.").  Thus, her request for leave to amend the complaint must be denied.  Doc. No. 11, p. 5, n. 2.

The Court has chosen to decline to exercise supplemental jurisdiction over Counts III, IV, V and VI pursuant to 28 U.S.C. § 1367(c)(3).  If Pitchford wishes to pursue these claims in a Pennsylvania court, she will have 30 days to take advantage of the statutory safe harbor provided by Congress.  28 U.S.C. § 1367(d).  If Pennsylvania law provides for a longer tolling period, she will have even more time to seek redress in a Pennsylvania court.

The motion to dismiss filed by Munhall, Ilgenfritz, Garcia, Curtain and Chereb (*Document No. 8*) will be granted as to Counts I and II and denied without prejudice as to Counts III and IV.  The motion to dismiss filed by the Cherevkas (*Document No. 14*) will be denied without prejudice.  Assuming that the allegations contained in the complaint are true, the Court holds that Pitchford's arrest was unconstitutional, that Munhall is not liable for the arrest under § 1983, that Ilgenfritz did not "subject" Pitchford to the "deprivation" of a right protected under federal law, and that the police officers named in the complaint are entitled to qualified immunity for purposes of Pitchford's claims under § 1983.[15]  The parties all remain free to litigate the

---

[15]The Court does not resolve any *factual* disputes that may arise between the parties in subsequent litigation.  The Court's holding is limited to the *legal* sufficiency of the allegations contained in the complaint.  If any of the Defendants dispute the *factual* basis for Pitchford's

remaining state law issues in a Pennsylvania court of competent jurisdiction.  An appropriate order follows.

McVerry, J.

---

allegations (for instance, by establishing that the officers had probable cause to arrest Pitchford *independent of the erroneously issued warrant*), they are not precluded from arguing that the arrest was legal.  Since no responsive pleading has been filed by any of the Defendants, and since the Defendants have thus far assumed (as the Court must) that the allegations contained in the complaint are true, the Court cannot ascertain which, if any, of the factual allegations may be contested by the Defendants.  The Court holds only that, if the allegations contained in the complaint are true, the arrest was unconstitutional.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KATHLEEN T. PITCHFORD,      )
                                )
      **Plaintiff,**          )
                                )
      v.                  )     **2:07-cv-440**
                                )
**BOROUGH OF MUNHALL,**     )
**OFFICER JAMES ILGENFRITZ,** )
**OFFICER GREG GARCIA, OFFICER** )
**MICHAEL CURTAIN, and OFFICER** )
**DARRAN CHEREB, individually and** )
**as police officers and officials for the** )
**Borough of Munhall, DANIEL** )
**CHEREVKA and KATHY JO** )
**CHEREVKA,** )
                                )
      **Defendants.**        )

## ORDER OF COURT

AND NOW, this 13th day of November, 2007, in accordance with the foregoing memorandum opinion, it is hereby **ORDERED, ADJUDGED and DECREED** that the Motion to Dismiss filed by Munhall, Ilgenfritz, Garcia, Curtain and Chereb (*Document No. 8*) is **GRANTED** as to Counts I and II of Plaintiff's Complaint and **DENIED WITHOUT PREJUDICE** as to Counts III and IV, and that the Motion to Dismiss filed by the Cherevkas (*Document No. 14*) is **DENIED WITHOUT PREJUDICE**. The Court declines to exercise supplemental jurisdiction over Counts III, IV, V and VI pursuant to 28 U.S.C. § 1367(c)(3).

The Clerk shall docket this case closed.


BY THE COURT:


s/  Terrence F. McVerry       
United States District Court Judge

cc: David B. Spear, Esquire
Email: david@msglaw.com

Robert J. Grimm, Esquire
Email: rgrimm@swartzcampbell.com

Sharon Lehman Bliss, Esquire
Email: Blisss@nationwide.com